NEW-YORK,<br>May, 1820.<br>OGDEN<br>v.<br>BARKER.

Ogden *against* Barker *and others.*

THIS was an action of *trover*, brought to recover the value of a cargo of flour laden on board the ship *Baltic Trader*, of *Alexandria;* tried before Mr. Justice *Yates*, at the *New-York* sittings, in *April*, 1819. The plaintiff gave in evidence, 1. A charter party, under seal, dated *New-York,* 21st of *January*, 1813, between the plaintiff and *Abraham Barker & Co.* as agents and in behalf of the defendants, be-

A hostile investment or blockade of the port of departure, does not dissolve a contract of charter party, and the master or owner has a right to retain the goods, until he can prosecute the voyage with safe-

ty, or the freighter tenders the whole freight, and demands the goods. Where a contract of affreightment, or charter party, was executed by the plaintiff and defendant, under their seals, for the transportation of goods from a port in *Virginia* to *Cadiz;* and the parties, on the same day, (*January* 26th, 1813,) made an agreement on a separate paper, not under seal, referring to the charter party executed by them, and stipulating that the owners should have on board a *Sidmouth license* for the protection of the ship and cargo : *Held,* that these were several and distinct contracts, and the supplementary agreement being illegal and void, did not affect or vitiate the charter party, which remained valid, and binding.

ing owners of the ship, by which the owners agreed to let to freight to the plaintiff, the ship *Baltic Trader*, for a voyage from *Alexandria* (*Virginia*) to *Cadiz*, for the purpose of transporting a cargo of flour, which the plaintiff agreed to lade on board the ship, and the defendants agreed to carry, at the freight of three dollars per barrel, with five per cent. primage, to be paid on delivery of the cargo at *Cadiz*.   2. A supplementary agreement or memorandum, not under seal, as follows : " The undersigned, having this day executed a charter party for the *Baltic Trader*, on a voyage from *Alexandria* to *Cadiz*, it is hereby further declared and agreed, that the owners or freighters of the said vessel are to furnish and put on board a *Sidmouth license*, for the protection of the ship and cargo, and are to pay the extra costs of such quantity of half barrels as may be required by the captain for storage.   The supercargo of the freighters is allowed a passage in the cabin, out and home, should the vessel return to the *United States*, free of expense, he finding his own stores." (Signed) " *Abraham Barker & Co. Abraham Ogden.   New-York*, 1st mo. 26, 1813." The ship sailed from *Alexandria*, *March* 2d, 1813, with a cargo consisting of 5055 1-2 barrels of flour, for account of the plaintiff. The waters of the Chesapeake were then closely invested and blockaded by a *British* fleet, which prohibited all ingress and egress.   The ship was stopped by the fleet, and ordered to return to *Alexandria*, and she accordingly returned.   In *July*, she renewed the attempt to prosecute the voyage, when, after proceeding a few miles down the *Potomac*, she was stopped by Capt. *Morris*, of the *United States* navy, who made the following endorsement on her clearance.   " In consequence of the ship *Baltic Trader* being laden with provisions, and the enemy's squadron now in the *Potomac*, which, with all the waters of the *Chesapeake*, being by them declared in a state of rigid blockade, I do hereby forbid the said *Baltic Trader* from proceeding below the U. S. frigate *Adams*, while the enemy are within the waters of the *Potomac*, unless she shall produce an order from the Secretary of the Navy to that effect.   *C. Morris*, Capt. &c. *July* 23, 1813."   On the 3d of *August*, the master of the *Baltic Trader* went on board the U. S. frigate *Adams* to ob-

tain permission to proceed, when the captain of the *Adams,*
again endorsed her clearance, forbidding her, pursuant to a
general order of the Secretary of the Navy, dated *July* 29,
1813, from proceeding, while the enemy's force should be
so disposed as to prevent a reasonable probability of her
getting to sea, without falling into their possession. The
order of the secretary of the navy, above referred to, was
published in the newspapers. In the fall of the year 1813,
the supercargo demanded the flour of the master of the
*Baltic Trader,* which he refused to deliver, without payment
of the freight, pursuant to the written orders of the owners
to him, to that effect. The supercargo offered to deposit
with the witness, the agent of the owners, the amount of the
freight, until a decision could be had as to the right to
freight, provided the cargo was delivered ; but the master
persisted in his refusal to deliver it, without receiving the
freight. In *August,* 1813, about 1000 barrels of flour, were
landed and stored, under the master's control, being then,
as the witness believed, sour. The ship and the remaining
flour on board, were captured in *August,* 1814, at *Alexan-
dria,* by the *British,* and carried away by them. It was
proved that the flour would be materially injured, by the
heat, while remaining on board from *February* to *August.*
The master of the *Baltic Trader* testified, that he had on
board, a document called a *Sidmouth license.* The witness
conversed with the supercargo, after the ship was ordered
back, about being discharged ; but the supercargo told him,
that he must hold himself in readiness ; and the ship was ac-
cordingly kept ready, with a full crew, until the cargo was
demanded, which was in *August,* but the freight was not of-
fered.

The case contained the *correspondence* between the par-
ties on the subject, and the evidence as to the value of the
flour, which it is unnecessary to state. A verdict was en-
tered for the plaintiff, for the value of the cargo, estimating
it at 3 dollars and 85 cents per barrel, and deducting the
proceeds of what was sold at *Alexandria,* and also the
amount of what was received from the captors for the pro-
ceeds of what was sold at *Bermuda.* It was agreed that the
verdict should be subject to the opinion of the Court on the

NEW-YORK, May, 1820.

OGDEN v. BARKER.

case made, with liberty to either party to turn the same into a special verdict.

*Wells*, for the plaintiff, contended, that this case was distinguishable from that of *Palmer* v. *Lorillard*, (16 *Johns. Rep*. 348.) That was an action of assumpsit brought on the bill of lading and was in affirmance of the contract; and the *gravamen* was, that the property was lost through negligence. The Court decided, that a hostile investment or blockade of the port of departure, did not dissolve the contract of affreightment. In this case, it appears, that while the vessel was lying at *Alexandria*, on the 2d of *August*, 1813, the act of Congress passed, prohibiting, under severe penalties, *American* vessels from sailing under *British* or *Sidmouth licenses*. Whatever opinion might have been entertained before the act, as to the legality of sailing with these licenses, there can be no doubt, that after this act was passed, it was unlawful to sail with such a license. This ship having such a license on board, could not, therefore, have proceeded on her voyage without a violation of the law. If, before the act of Congress, it was illegal to proceed with such a license, then the contract of charter party could not be executed; the defendants had no right to insist on its performance. While the property was within the waters of the *United States*, there was, to both parties, a *locus penitentioe*. This is not one of those cases in which the maxim, *in pari delicto, potior est conditio possidentis*, will apply. This action is not brought to enforce the contract, but proceeds on the ground of its disaffirmance; and as if it had never existed. The property of the plaintiff is found in the possession of the defendants, which they refuse to deliver, on demand; they must justify that refusal; they cannot insist on the detention of the property, except on the ground of a contract which is unlawful. The act of Congress, if it is allowable so to speak, adds to the illegality of the contract, and renders the prosecution of the voyage still more unlawful. The supplementary clause, as to the license, though not in the body of the charter-party, was executed on the same day, and being *in pari materia*, it is to be taken as part of the same contract. They form one entire contract between the parties; and the put-

ting a *Sidmouth* license on board was a material part of that contract. Neither party is at liberty to cut out the unsound part, and avail himself of the part which is sound. The canker remaining vitiates the whole.

The defendants here, did not rest themselves on any equitable principle of the maritime law of *Europe*, and demand a rateable portion of the freight; but demanded the whole freight, as if the entire voyage had been completed. If not entitled to the entire freight, they cannot now put themselves on any other ground than that first taken by them, when they refused to deliver the cargo, and demand a reasonable compensation for their trouble and expense. When the defendants insisted on the payment of the whole freight, the plaintiff was not bound to tender any less sum, which he might suppose to be a reasonable compensation to the defendants, in order to entitle himself to demand his goods.

*T. A. Emmet*, contra. The case of *Palmer* v. *Lorillard*, having decided the point as to the effect of the blockade on the charter party, that question is at rest. But an attempt is made to distinguish this case, and it has been argued, that the charter party and supplementary agreement, form but one contract. But the charter party is executed under the hands and *seals* of the parties; and the memorandum of the agreement as to the *Sidmouth* license, is made on a separate and distinct paper, without seal. They are, therefore, distinct and independent contracts.

Sailing under licenses from an enemy was unlawful, before the act of Congress passed. They were unlawful by the common law, which avoids that part only of the contract which is unlawful, and preserves the rest. (*Hyslop* v. *Clark*, 14 *Johns. Rep.* 465. 1 *Mod.* 35. 2 *Wils.* 351. *Hob.* 14.)

The contract of charter party, then, remaining, the defendants were not bound to deliver the cargo, until they received the whole freight. The act of Congress did not alter the state of the parties, or operate on the original contract, so as to render it void.

*D. B. Ogden*, in reply. The performance of this con-

tract by either party would be illegal. This charter party is not properly an instrument under seal; it is not so executed as to give the plaintiff an action of covenant upon it. It is not under the *seals* of the several defendants. It is executed by *Abraham Barker*, for himself, and the other owners; it is the *seal*, then, of *Abraham Barker* alone. The two papers make but one contract.

When the goods were demanded, the defendants claimed a *lien* on them, for the whole freight; they cannot now be permitted to vary their ground, and insist that the plaintiff ought to have tendered *half*.

Putting the contract between the parties entirely out of view, we have the facts, that the vessel had a *Sidmouth* license on board; and that after the act of Congress was passed, prohibiting vessels from having such licenses, the master kept the license on board, and insisted on going to sea with it. The case is clearly distinguishable from that of *Palmer* v. *Lorillard*; for this contract was either illegal in its inception, or made so, afterwards, by the act of Congress.

SPENCER, Ch. J. delivered the opinion of the Court. The case of *Palmer* v. *Lorillard*, (16 *Johns. Rep.* 356.) decided in the Court of Errors, entirely disposes of the question, as to the plaintiff's right to demand back the cargo, without the payment of freight, and the question does not arise, whether the plaintiff ought to have tendered full freight or less, because there has been no tender of any freight. The leading facts in this case are so entirely like those in *Palmer* v. *Lorillard*, that there is no distinguishing the two cases. It was there decided, that the blockade of the *Chesapeake* by the enemy's squadron, did not dissolve the contract of affreightment, but merely suspended its execution; and that the ship owners had a right to retain the goods until they could prosecute the voyage, or unless the plaintiff tendered the whole freight, to which the ship owners would have been entitled on the completion of the voyage, or unless the contract was rescinded by mutual consent. To this decision we are bound to submit.

But it has been insisted, that the voyage from *Alexandria*

to *Cadiz*, under a *British* license, was illegal, and that the defendants, therefore, had no right to retain the cargo, in order to prosecute such voyage, and ought to have delivered it to the plaintiff upon his demand.

The parties entered into a charter-party, under hand and seal, on the 21st of *January*, 1813, by which the defendants, as owners of the ship *Baltic Trader*, agreed to hire, and let to freight to the plaintiff, the said ship, for a voyage from *Alexandria* to *Cadiz*, to transport a cargo of flour, which the plaintiff agreed to lade, and the defendants to transport at a freight of three dollars per barrel, and five per cent. primage, to be paid on delivery at *Cadiz*. A supplementary agreement was entered into between the parties, not under seal, stating, among other things, that the parties had that day executed a charter-party, and further agreeing, that the owners or freighters of the vessel were to furnish and put on board a *Sidmouth* license, for the protection of the ship and cargo. It is undoubtedly true, independently of the act of Congress of the 2d of *August*, 1813, that sailing under an enemy's license, would render the voyage illegal, and the vessel and cargo confiscable. But the question is, whether the agreement to sail under an enemy's license, being distinct, and independent of the charter-party, will attach upon that contract, and vitiate it. I am of the opinion, that the two contracts are severable; and that the last does not avoid the first. The contract of affreightment was full, complete, and perfect, under which the parties acquired reciprocal rights ; it was consummated by sealing and delivery. Then comes the agreement, that the ship shall sail under an enemy's license, posterior in point of time, and by parol. It is admitted, that this agreement was void, because illegal. Why should it infect and destroy a contract legally made, and under which rights had been acquired ? It is in vain to say, that it was made on the same day with the charter-party, and is in *pari materia*. It would be parcel of the contract, were it not wholly inefficacious. *Utile per inutile non vitiatur*. A vicious contract, which is, *ipso facto*, a nullity, cannot be incorporated with a prior lawful and valid one. If a valid contract should be made between *A.* and *B.*, that *A.* should

NEW-YORK,
May, 1820.

JACKSON
v.
SCOTT.

perform a journey on *B.'s* lawful business, and a subsequent one should be entered into on the same day, that on the journey, *A.* should commit a crime, the latter contract would be void, but it would not dissolve the first, or exonerate the parties for their liabilities under it. In *Hyslop* v. *Clark*, (14 *Johns. Rep.* 465.) Mr. Justice *Van Ness* takes the distinction between a contract made void by statute, and a contract void at the common law. In the first case, when a bond is void in part, as against the positive provisions of a statute, the whole bond is void. In the latter case, the common law makes void only that part where the fault is, and preserves the rest. Here the contract was made void at the common law, for it was before the act of Congress; and if the distinction be sound, and I incline to think it is, if the two contracts were in the same instrument, the agreement relative to the license would be void, and the charter party would remain uncontaminated by it. I place my opinion on the ground that the contracts were several, the one valid and the other void; and that the void agreement never attached to, or became parcel of, the contract of affreightment.

Judgment for the defendant.